Filed 5/28/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JACKIE ONEAL USHER et al., | D077133 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2014-00038321-CU-OE-CTL) |
| SHIRLEY WHITE, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge. Affirmed.

Niddrie Addams Fuller and John S. Addams; Hogue & Belong and Jeffrey L. Hogue and Tyler J. Belong, for Plaintiffs and Appellants.

Higgs, Fletcher & Mack, John Morris and Rachel Moffitt Garrard, for Defendant and Respondent.

Plaintiffs Jackie Oneal Usher (Usher) and Eric Leung (Leung), on behalf of themselves and all others similarly situated (sometimes collectively, plaintiffs), appeal the judgment for defendant Shirley White (Shirley). Plaintiffs in 2014 brought a putative wage-and-hour class action lawsuit against defendants White Communications, LLC (White Communications or the company) and DirecTV, LLC (DirecTV). In early 2018, plaintiffs

amended their complaint to add Shirley and her son Jeff White (Jeff),[1] based on Labor Code[2] section 558.1, which became effective on January 1, 2016.

Under section 558.1, a "natural person who is an owner, director, officer, or managing agent" of an employer may be personally liable if that person, on behalf of the employer, "violates, or causes to be violated" certain wage and hour laws as provided in the statute. The court granted summary judgment for Shirley, concluding as a matter of law she was not liable under section 558.1 because it found undisputed evidence that she did not participate in the determination to classify plaintiffs as independent contractors. The court therefore held Shirley did not "cause[]" any violation of the enumerated sections of the Labor Code, as set forth in section 558.1 and in plaintiffs' operative complaint.

As we explain, we interpret the words "violates, or causes to be violated" in section 558.1 in their ordinary meaning to impose liability on an "owner" such as Shirley if, when acting on behalf of an employer, the "owner" has personal involvement in the enumerated violations in section 558.1; or, absent personal involvement, has sufficient participation in the activities of the employer—including, for example, over those responsible for the alleged wage and hour violations—such that the "owner" may be deemed to have contributed to, and thus have "cause[d]" such violations.

The undisputed evidence in this case shows that Shirley was not personally involved in the determination to classify plaintiffs as independent contractors, which purported misclassification forms the basis of their class

[1]    Jeff, White Communications, and DirecTV are not parties in this appeal.

[2]    Unless otherwise noted, all further statutory references are to the Labor Code.

2

and subclass allegations and their 10 causes of action; and that she also lacked sufficient participation in the operation and management of White Communications to create a triable issue of material fact that she "cause[d]" the wage and hour violations. We therefore independently conclude the order granting Shirley summary judgment was proper.

FACTUAL AND PROCEDURAL OVERVIEW

*Operative Complaint*

Usher in November 2014 filed this lawsuit against White Communications and DirecTV. Usher in January 2018 amended the complaint to add Shirley and Jeff as individual defendants under section 558.1. In February 2019, Usher filed the operative second amended complaint, adding Leung as a plaintiff.

The factual allegations in the operative complaint provided White Communications hired Usher as a service technician in October 2012. It alleged that plaintiffs were service technicians who contracted with White Communications, but who worked exclusively for DirecTV; that White Communications was indirectly controlled by DirecTV; that White Communications was authorized to hire service technicians to install DirecTV's satellite systems in customers' homes and businesses according to DirecTV's specification; that White Communications required plaintiffs sign an "Installation Services Agreement" purportedly creating an independent contractor relationship between defendants and plaintiffs; and that while White Communications supervised plaintiffs' service technicians, that supervision was subject to DirecTV's "strict scrutiny."

The operative complaint further alleged DirecTV customers were led to believe that the service technicians were employees of DirecTV, as the technicians dressed in clothing with the DirecTV logo and arrived for

3

appointments in a vehicle bearing that logo; customers called DirecTV for an appointment and once scheduled, White Communications was responsible for dispatching a service technician to that appointment; and the service technicians only installed and repaired DirecTV satellite systems.

The operative complaint alleged defendants misclassified plaintiffs as independent contractors in order to force them to routinely work seven days a week, in shifts that sometimes lasted over 10 or 12, but no less than eight, hours; that defendants monitored plaintiffs' schedules and workload through a handheld device and software they provided; that on average, plaintiffs worked about "55–60 hours," and sometimes as much as "70–80 hours" a week; and that defendants never paid plaintiffs any overtime wages. Instead, defendants paid plaintiffs by the "job," and plaintiffs typically earned about $250 to $275 a day.

White Communications also had no employee manual. Plaintiffs alleged that defendants therefore had no policy related to overtime or meal and rest breaks; that defendants did not pay plaintiffs "premium wages" for their failure to provide plaintiffs the opportunity to take meal and rest breaks; that defendants did not provide plaintiffs with a 30-minute meal period even though plaintiffs worked shifts over five hours; and that defendants also never permitted plaintiffs to take rest breaks.

Plaintiffs also alleged they were unable to take meal and rest breaks because of DirecTV's "On Time Guarantee," which required service technicians to arrive at an appointment on time or face a $50 charge or even suspension for violation of this policy. Because of the "On Time Guarantee" and the scheduling of appointments close in time, service technicians who took meal and rest breaks risked violating this policy.

4

Of particular significance to the issues on appeal, the class allegations of the operative complaint defined the class as "[a]ll current, former, or prospective service technicians or similar type positions that are *misclassified as independent contractors* of Defendants in the State of California who have not received compensation for all time worked and all overtime worked in violation of the California Labor Code and applicable wage orders from November 10, 2010 to the date of judgment." (Italics added.) Plaintiffs also sought certification of seven subclasses for various Labor Code violations, *all* of which were based on their alleged misclassification as independent contractors; and alleged common questions of fact or law predominated over questions affecting individual class members including on the issue of whether "Defendants *misclassified* service technicians or similar type job positions as independent contractors." (Italics added.)

Plaintiffs asserted 10 causes of action in their operative complaint. In each cause of action, they incorporated the above factual and class allegations. Plaintiffs' causes of action and their request for damages were therefore premised on being *misclassified* as independent contractors, which in turn caused the alleged Labor Code violations.

*Summary Judgment*

In February 2019, Shirley moved for summary judgment/summary adjudication. Shirley argued she was not personally liable under section 558.1 because she neither employed plaintiffs nor "violate[d]," or "cause[d] to be violated," any provision of the Labor Code. In support of the motion, Shirley declared under penalty of perjury that Jeff formed White Communications in Iowa; that she at one point was designated Secretary Treasurer for the company; that she "never participated in the day-to-day operations" of the company and was "not a 'decisionmaker' in terms of

5

operational/managerial decisions by White Communications"; that, although she assisted with "creating the very first administrative email account for White Communications," she did "not recall accessing the account for any purpose"; and that, although she signed loan documents on behalf of White Communications, once reviewed missing credit card receipts, and was listed as a signatory on the company bank account, she was "never involved in actually preparing or processing any checks where [her] electronic signature was used."

Shirley declared that she had no recollection of ever interacting with any "outside service technicians"; that she did not participate in the decision to classify technicians as independent contractors, nor was she consulted about that decision; that she neither drafted nor contributed to the drafting of any of the independent contractor agreements between White Communications and service technicians, including those who worked in California; that she did not sign any of those agreements; and that she never hired any service technician, determined their payment plans, prepared or issued any schedules, or arranged for equipment to be made available. Nor did she personally pay any service technician from her individual account.

Jeff also filed a declaration under penalty of perjury in support of Shirley's motion. Jeff declared he formed White Communications in 2007, the company was headquartered in Bloomfield, Iowa, and it stopped doing business in September 2016. At one point, White Communications provided services to DirecTV in 12 states, including California. Jeff confirmed that when he formed the company Shirley was identified as White Communications' Secretary Treasurer; that despite such designation, she "never participated in the day-to-day affairs of the company nor was she involved with managerial/operational decisions," as he handled those

6

responsibilities; and that while Shirley was listed as a signator on the company bank account, she "never actually prepared or processed checks distributed to service technicians."

According to Jeff, a prospective service technician could seek to contract with White Communications using the online contract request system posted on the company website. If qualified, White Communications would provide an applicant with an independent contractor agreement that described the nature of the relationship, the compensation structure, and the scope of services to be performed by the technician.

Attached to Jeff's declaration were copies of various independent contractor agreements White Communications used from 2010 through September 2016; and copies of the independent contractor agreements separately signed by Usher and Leung. Jeff signed the agreements with Usher and Leung on behalf of White Communications.

Jeff declared Usher began working in Greenville, Mississippi as an independent contractor of the company. Usher became a "traveling" service technician and ultimately worked for White Communications in San Diego from about January 2013 to August 2014. Leung worked for White Communications as a service technician between 2010 and 2013. According to Jeff, Leung was rehired in 2015 as a company "Site Supervisor." Although Leung sought to resume working as an independent contractor, White Communication classified him as an employee. Leung remained in that position until July 2016.

In their opposition to Shirley's motion, plaintiffs argued there was "no need to establish a direct causal connection" between Shirley and the purported Labor Code violations of White Communications because under section 558.1 Shirley was potentially liable merely because she was the

7

"acting owner, President, and managing member of White Communications, LLC during the relevant time period." Plaintiffs also argued that even if such a showing was required, triable issues of material fact existed as to whether she contributed to the alleged Labor Code violations of the company.

This included evidence that Shirley registered White Communications to conduct business in California; signed paperwork that led to the cessation of company business in California; represented to service technicians she owned White Communications, including on the company website which showed a picture of her and her late husband Jack White (Jack) and describing them as owners; electronically signed the paychecks of plaintiffs; sent, received, and forwarded work-related e-mails from the official "Whitecomm@yahoo.com" address; and attended a training meeting in Iowa for service technicians.

Plaintiffs' opposition included a portion of the deposition transcript of Usher. Usher declared he recognized Shirley as a result of seeing her picture in the Greenville, Mississippi office during a training session, before he came to work in California. Usher, however, never met Shirley in person. He also recalled seeing Shirley in 2019 on a social media page linked to White Communications. Lodged as exhibits in support of the opposition were a series of paychecks made payable to Usher when he lived in Mississippi that were electronically signed, "Shirley J. White."

A portion of Leung's deposition was also included in the opposition. Leung declared he met Shirley during a training session in Iowa. Leung, however, could not recall when he met Shirley, but estimated it was 2012 or 2013. He further declared that he knew Shirley was an owner of White Communications; that he had spoken to her during work hours by phone, although he could not recall when they spoke or what they spoke about other

8

then it was for "work"; and that he could not recall if he spoke with her during his "second stint" with the company.

Shirley in reply argued that plaintiffs were seeking to hold her "strictly liable" under section 558.1 for the alleged wage and hour violations of White Communications merely because she was an owner and member of the company. Shirley also argued that all of plaintiffs' Labor Code violations were premised on their classification as independent contractors and not employees of the company. As such, Shirley argued that summary judgment should be granted because "she was not associated with, or in any way involved in, the company 'classification' decision"; and thus, did not "cause[]" any company violation within the meaning of section 558.1. In support of this argument, Shirley noted that plaintiffs in their opposition did not dispute that she (1) never participated in a discussion regarding the classification of service technicians; (2) did not draft or edit the independent contractor agreements; and (3) was not a signatory to any such agreements.

Finally, Shirley in her reply noted that plaintiffs did not oppose summary judgment based on the argument she was their "employer," as opposed to a "person acting on behalf of an employer" under section 558.1.

After the parties' briefing was completed, Shirley's was deposed in Iowa, just days before the summary judgment hearing. She testified she signed a Statement of Information that had been filed with the California Secretary of State on December 30, 2016, in which she represented she was an owner of White Communications. She also testified that she along with the other owners of White Communications voted to cease operations in California; that she estimated she talked to her son Jeff about once a week about the company, and possibly some weeks, twice a week; that while Jeff was running White Communications, she was busy working elsewhere full

9

time; and that while they may have discussed company business, she did not recall ever having a discussion with Jeff about "certain employees."

Regarding the e-mail address whitecomm@yahoo.com, Shirley testified the account was set up when the company was first started. She could not recall ever using the e-mail for company business or for personal reasons. She also testified she was certain she did not author or send most, if not all, of the e-mails lodged by plaintiffs in their opposition allegedly to show her involvement in White Communications.

Shirley testified as an owner she had access to the company bank account. So too did her husband Jack until he passed away.[3] Shirley believed her son Jeff also was a signator on the account, but he typically went to her if "he needed something" from the account.

*Court's Ruling*

The court at the September 27, 2019 summary judgment hearing announced its tentative was to deny the motion because Shirley signed the paychecks, which the court found "implies the knowledge of what is going [on]" in the business and therefore created a triable issue of fact. After hearing argument from counsel, the court took the matter under submission. Before doing so, counsel agreed the court could read Shirley's entire deposition transcript.

The court in its October 3, 2019 minute order reversed its tentative and granted summary judgment for Shirley. The court interpreted section 558.1 and analyzed the issue as follows: "[T]he employer or other person acting on behalf of an employer, must violate, or cause a violation. The statute does

---

[3]    After Jack's death, the owners of White Communications were as follows: Shirley (50 percent); Jeff (30 percent); Cassie White (Jeff's daughter, 10 percent); and Jerry Newsom (a former supervisor, 10 percent).

not create strict liability on behalf of the individual actors. The Labor Code requires some participation in the violation.

"The question becomes whether defendant Shirley White met her burden that she not 'cause the violation?' The undisputed evidence . . . shows that Ms. White did not cause the alleged Labor Code violations. The allegation is that White Communications misclassified plaintiffs. The misclassification caused the alleged Labor Code violations. Plaintiffs do not have a viable Labor Code violation theory unless it is first established that White Communications wrongfully classified them as independent contractors. Based on the evidence presented, Shirley White was not associated with, or in any way involved in, the company's 'classification' decision and therefore could not have 'caused' any violation.

"Ms. White never participated in a discussion regarding the classification of the technicians as independent contractors and did not draft or edit the independent contractor agreements, and was not a signatory for any of the contracts. Ms. White did not draft, nor contribute to the drafting of, the independent contractor agreements entered into by White Communications and service technicians in California. [Citations.] Nor did Ms. White sign any independent contractor agreements on behalf of White Communications for service technicians in California."

DISCUSSION

A. *Summary Judgment*

A court may grant a motion for summary judgment when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.) "When a defendant moves for

11

summary judgment in a situation in which the plaintiff at trial would have the burden of proof by a preponderance of the evidence, the defendant may, but need not, present evidence that conclusively negates an element of the plaintiff's cause of action. Alternatively, the defendant may present evidence to ' "show[ ] that one or more elements of the cause of action . . . cannot be established" by the plaintiff.' " (*Mattei v. Corporate Management Solutions, Inc.* (2020) 52 Cal.App.5th 116, 122 (*Mattei*) ; see Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853.) The moving party, in this case Shirley, has the burden to show that plaintiffs have not established, and cannot reasonably expect to establish, the elements of their causes of action. (See *Mattei*, at p. 122; *Ennabe v. Manosa* (2014) 58 Cal.4th 697, 705.) "Once the moving defendant has met its burden, the burden shifts to the plaintiff to show that a triable issue of fact exists." (*Melchior v. New Line Productions, Inc.* (2003) 106 Cal.App.4th 779, 786–787 (*Melchior*).)

We review a grant of summary judgment de novo and "exercise our independent judgment in determining whether there are no triable issues of material fact and the moving party thus is entitled to judgment or adjudication as a matter of law." (*Melchior*, *supra*, 106 Cal.App.4th at p. 787.) We " ' "consider[ ] all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 (*Yanowitz*).)

12

B. *Section 558.1*

Our high court has recognized that the "full and prompt payment of wages is of fundamental importance to the welfare of both workers and the State of California. The Legislature has so recognized by crafting extensive remedies to ensure that employees are paid in full, and in penalizing employers that fail to live up to their obligations. This court has so recognized in upholding the Legislature's authority to adopt new solutions to combat the problem." (*Voris v. Lampert* (2019) 7 Cal.5th 1141, 1162–1163 (*Voris*).) Section 558.1 is an example of such a remedy.

Effective January 1, 2016, section 558.1 was included in Senate Bill No. 588 in which our Legislature addressed the problem of "[i]rresponsible employers [that] may have already hidden their cash assets, declared bankruptcy, or otherwise become judgment proof" to avoid adverse wage judgments. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 588 (2015–2016 Reg. Sess.) as amended July 1, 2015, p. 4.) Senate Bill No. 588 was designed to address the problem by enhancing the sanctions against employers that ignore adverse wage judgments, as the "vast majority of wage theft victims received nothing, and those that received anything received little of what they were legally due." (Sen. Com. on Labor & Industrial Relations, Analysis of Sen. Bill No. 588 (2015–2016 Reg. Sess.) Apr. 29, 2015, pp. 5–6.)

Among other wage-payment regulation, "Senate Bill 588 also targets individual officers who are involved in the failure to pay wages or to satisfy final wage judgments" through enactment of section 558.1. (*Voris, supra*, 7 Cal.5th at p. 1161.) By making certain individuals such as owners, directors, officers, and managing agents personally liable, the Legislature sought to "discourage [such individuals] from rolling up their operations and walking

13

away from their debts to workers and starting a new company." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 588 (2015–2016 Reg. Sess.) as amended Sept. 4, 2015, p. 5; see Leg. Counsel's Digest to Sen. Bill No. 588 (2015–2016 Reg. Sess.) p. 2 [recognizing this "bill would provide that any employer or other person acting on behalf of an employer, as defined, who violates, or causes to be violated, any provision regulating minimum wages or hours and days of work in any order of the Industrial Welfare Commission, or violates, or causes to be violated, other related provisions of law is authorized to be held liable as the employer for such violation"].)

Section 558.1 provides: "(a) Any employer or other person acting on behalf of an employer, who violates, or causes to be violated, any provision regulating minimum wages or hours and days of work in any order of the Industrial Welfare Commission, or violates, or causes to be violated, Sections 203, 226, 226.7, 1193.6, 1194, or 2802,[4] may be held liable as the employer for such violation. [¶] (b) For purposes of this section, the term 'other person acting on behalf of an employer' is limited to a natural person who is an owner, director, officer, or managing agent of the employer, and the term 'managing agent' has the same meaning as in subdivision (b) of Section 3294 of the Civil Code. [¶] (c) Nothing in this section shall be construed to limit the definition of employer under existing law."

C. *Analysis*

At the outset, it is important to address what is not at issue in this case. As noted, plaintiffs do not allege that Shirley was their "employer." (See *Martinez v. Combs* (2010) 49 Cal.4th 35, 64 [concluding "employ" under

---

4    These Labor Code sections in section 558.1, subdivision (a) are sometimes referred to herein as the "enumerated provisions."

14

the definition of the Industrial Welfare Commission means "(a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship"].) The parties also do not dispute that Shirley qualified as an "other person acting on behalf of an employer" under section subdivision (a) of section 558.1, inasmuch as she was an "owner" and member of White Communications as described in subdivision (b) of that statute; or that section 558.1 creates a private right of action against an "owner" such as Shirley.

No Court of Appeal has addressed under what circumstances an "owner, director, officer, or managing agent" of an employer may be held liable under section 558.1. Federal courts within the United States Courts of Appeal for the Ninth Circuit offer some limited guidance on this issue, however.

In one case, the district court concluded that to hold an "owner, director, officer, or managing agent" liable under section 558.1, a plaintiff must allege facts showing the individual defendant was "personally involved" in the alleged violations. (See *Rios v. Linn Star Transfer, Inc.* (N.D.Cal. 2020) 2020 WL 1677338, at *6 [concluding the allegations against the individual defendants "do not set forth facts giving rise to a plausible inference that they are *personally* liable pursuant to Section 558.1 for the Labor Code violations alleged" because the plaintiffs merely rely on the individual defendants' "respective positions 'as owners, directors, officers and/or managing agents of [the employer]' "]; see also *Jacobs v. Sustainability Partners LLC* (N.D.Cal. 2020) 2020 WL 5593200, at *13 [granting with leave to amend the individual defendant's motion to dismiss because the plaintiff's complaint "is devoid of any factual allegations concerning [the individual

15

defendant's] role in [the employer's] failure to reimburse business expenses owed to plaintiff"]; *Carter v. Rasier-CA, LLC* (N.D.Cal. 2017) 2017 WL 4098858, at \*5 [dismissing claims premised on liability under section 558.1 because the plaintiffs failed to "allege specific facts to establish that [the individual defendant] was personally involved" in the state wage and hour violations].)

In another case, the district court concluded a plaintiff must allege facts showing an "owner, director, officer, or managing agent" of an employer was engaged in "individual wrongdoing" in order to be liable under section 558.1. (See *Plaksin v. NewSight Reality, Inc.* (C.D.Cal. 2019) 2019 WL 4316255 at \*4 [dismissing Labor Code claims against an individual defendant because "allegations pertain[ed] only to [his] role as a corporate officer," and included no "allegation of individual wrongdoing"].)

In yet another case, the District Court refused to interpret section 558.1 to require the plaintiffs to include allegations in their state law claims that would "in effect, pierce the corporate veil to hold corporate owners, shareholders, or other officers liable for wrongdoing committed by the employer corporation" because this statute makes "owners, directors, officers, or managing agents . . . liable for their *own* violations of the enumerated state laws or for causing such violation." (*Roush v. MSI Inventory Serv. Corp.* (E.D.Cal. 2018) 2018 WL 3637066, at \*2, italics added.)

16

We independently conclude the words "violates, or causes to be violated" in section 558.1, subdivision (a) have an ordinary meaning.[5]  (See *Russell City Energy Co., LLC v. City of Hayward* (2017) 14 Cal.App.5th 54, 64 [noting in the absence of a definition, we presume the Legislature intended the word or words to be understood " 'in [their] ordinary sense and, consequently, we may refer to [those words'] dictionary definition[s] to ascertain [their] ordinary, usual meaning' "]; see also *Cacho v. Boudreau* (2007) 40 Cal.4th 341, 349 [interpreting the undefined word "rent" in the Mobilehome Residency Law to have its "ordinary meaning"]; *Alatriste v. Cesar's Exterior Designs, Inc.* (2010) 183 Cal.App.4th 656, 663 [recognizing the interpretation of a statute presents a legal question subject to independent review on appeal].)

As such, we further conclude that to be held liable under section 558.1, an "owner" such as Shirley must either have been personally involved in the purported violation of one or more of the enumerated provisions; or, absent such personal involvement, had sufficient participation in the activities of the employer, including, for example, over those responsible for the alleged wage

---

[5]     As relevant here, the online Oxford English Dictionary defines the verb "violate" to mean "[t]o break, infringe, or contravene (a law, rule, etc.).  Also: to fail to maintain or respect (a right or privilege)." (https://www.oed.com/view/Entry/223627?rskey=37C3qq&result=2 [as of May 24, 2021], archived at <https://perma.cc/8KAX-SBSR>.  The Oxford English Dictionary defines the verb "cause" to mean "[t]o be the cause of; to effect, bring about, produce, induce, make" (https://www.oed.com/view/Entry/29148?rskey=m1qwsa&result=2&isAdvanced=false [as of May 24, 2021], archived at <https://perma.cc/X5CJ-V89Q>); and the noun "cause" to mean among other definitions, "[t]hat which produces an effect; that which gives rise to any action, phenomenon, or condition." (https://www.oed.com/view/Entry/29147?rskey=m1qwsa&result=1&isAdvanced=false [as of May 24, 2021], archived at <https://perma.cc/E45U-64JF>.)

and hour violations, such that the "owner" may be deemed to have contributed to, and thus for purposes of this statute, "cause[d]" a violation.

Determining whether an "owner" "violate[d], or cause[d] to be violated" the enumerated provisions in subdivision (a) of section 558.1 cannot be determined by any bright line rule, as this inquiry requires an examination of the particular facts in light of the conduct, or lack thereof, attributable to the "owner." But where, as here, the material facts are not in dispute, a trial court may resolve this issue as a matter of law. (See *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 751, 761, fn. 9 [recognizing that the test for "actual injury" in a legal malpractice action "require[s] examination of the particular facts of each case in light of the alleged wrongful act or omission"; but further recognizing that although determining when actual injury occurred is predominantly a factual inquiry, " '[w]hen the material facts are undisputed, the trial court can resolve the matter as a question of law in conformity with summary judgment principles' "].)

Turning to the instant case, the undisputed facts show Shirley did not participate in the decision of White Communications to classify plaintiffs as independent contractors, which classification is the basis of plaintiff's class and seven sub-class allegations, and 10 causes of action. Indeed, it is undisputed that Shirley was never consulted about, or provided any guidance regarding, the classification of service technicians; played no role in the hiring of technicians; did not create, draft or contribute to the content of any of the independent contractor agreements utilized by White Communications; and did not sign any such agreements on behalf of the company.

Moreover, Shirley also proffered evidence to show her involvement in the operation and management of White Communications was extremely

18

limited. This evidence showed that, although Shirley (and her late husband Jack) signed loan documents and helped fund the company, she neither participated in the day-to-day operations of the company nor was she a " 'decisionmaker' in terms of operational/managerial decisions by White Communications." Instead, that responsibility fell on Jeff and his management team, who ran the company and who also made the decision to classify plaintiffs as independent contractors.

Based on this evidence, we conclude Shirley as the moving party satisfied her burden to show plaintiffs have not established, and cannot reasonably expect to establish, the elements of each of their causes of action, which, as we have repeatedly noted, are conditioned on a misclassification theory. (See *Mattei*, *supra*, 52 Cal.App.5th at p. 122.) The burden therefore shifted to plaintiffs to show that a triable issue of material fact exists that Shirley "cause[d]" a violation. (See *Melchior*, *supra*, 106 Cal.App.4th at pp. 786–787.)

Plaintiffs acknowledge Shirley did not directly participate in the decision to classify them as independent contractors and not employees of the company. They nonetheless argue there are triable issues of material fact whether Shirley's involvement in the operation and management of White Communications "cause[d]" the violation of one or more of the enumerated provisions.

Specifically, plaintiffs rely on evidence Shirley's signature electronically appeared on their paychecks, citing *McDonald v. Ricardo's on the Beach, Inc.* (C.D.Cal. 2013) WL 153860 (*McDonald*) for support. In *McDonald*, a co-owner individual defendant moved for summary judgment after he, the restaurant, and other owners were sued for various federal and state wage and hour violations. The defendant argued he was an absentee owner and

19

thus could not be held liable under the Fair Labor Standards Act (FLSA) and the Private Attorneys General Act (PAGA). (*McDonald*, *supra*, 2013 WL 153860, at *2.) The court denied the motion, finding triable issues of material fact existed whether the defendant qualified as an "employer" under the FLSA based on evidence that he had the power to hire, promote, and fire employees; made decisions regarding the number of hours worked by cooks and pre-cooks; signed the restaurant's "compensation and overtime policy"; and maintained "an electronic record of hours worked and wages paid to [restaurant] employees through TLD, another business owned by [the defendant]." (*Ibid.*)

The defendant in *McDonald* next argued summary judgment was proper because FLSA liability could only be imposed on individuals "who personally and directly engaged in the violative conduct itself."[6] (*McDonald*, *supra*, 2013 WL 153860, at *3.) The district court found this argument unpersuasive, noting the evidence showed a triable issue of fact as to whether the defendant owner had " 'operational control of significant aspects of the corporation's day-to-day functions; the power to hire and fire employees; the power to determine salaries; [and] the responsibility to maintain employment records.' (*Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir. 1999)." (*Ibid.*) The court thus denied the defendant's motion on his personal liability under FLSA.

The defendant next argued he could not be personally liable under PAGA for a violation of sections 510 and 588, the latter of which the court

---

6    FLSA liability extends to "any person" acting in the employer's interest in dealing with employees. (29 U.S.C. § 203, subd. (d).) "Person" is defined under FLSA to mean an individual or group of individuals. (*Id.*, subd. (a).)

found could make an individual defendant liable for civil penalties[7] under section 510 if he or she "is 'acting on behalf of an employer who violates, or causes to be violated' [section] 510." (*McDonald*, *supra*, 2013 WL 153860, at *3.) The court found triable issues of material fact existed whether the defendant violated, or caused to be violated, section 510 (i.e., failure to pay overtime wages), based on evidence the plaintiffs' paychecks "were prepared at a company owned and operated" by the defendant and his signature appeared on the "document establishing [the restaurant's] overtime policy" (*ibid.*); he made the decision to pay employees who worked overtime "through multiple paychecks and subsequently ended that policy" (*ibid.*); and he "also signed the paychecks and sometimes brought them to the restaurant to be distributed." (*Ibid.*)

We find *McDonald* inapposite to the facts of our case. Unlike the individual owner in *McDonald*, here there is no triable issue of material fact that Shirley was plaintiffs' "employer," despite her being an owner and member of White Communications. Indeed, plaintiffs do not even make this argument on appeal, as we have noted.

Moreover, the evidence is undisputed that Shirley's signature appeared electronically on plaintiffs' paychecks merely because she had signed bank documents when the company was founded in about 2007; that unlike the co-owner defendant in *McDonald*, she was not responsible for payroll, never personally prepared paychecks, did not own and operate a company that prepared payroll or paychecks, and never personally presented the checks to

---

7    Subdivision (a) of section 558 in part provides: "Any employer or other person acting on behalf of an employer who violates, or causes to be violated, a section of this chapter or any provision regulating hours and days of work in any order of the Industrial Welfare Commission shall be subject to" civil penalties as set forth in the statute.

workers; and that also unlike the co-owner in *McDonald*, she did not create company policy with respect to various wage and hour laws, including overtime pay, and how workers would be paid for overtime (i.e., in multiple checks).

Liberally construing the evidence in support of plaintiffs' opposition to summary judgment and resolving all doubts concerning the evidence in their favor (*Yanowitz*, *supra*, 36 Cal.4th at p. 1037), we nonetheless independently conclude evidence that Shirley's signature was electronically printed on plaintiffs' paychecks does not create a triable issue of material fact that she in some way "cause[d]" a violation as a result of her alleged involvement in the company's operation and management.

To defeat summary judgment, plaintiffs also rely on evidence Shirley's name appeared on e-mails sent from the official company address of Whitecomm@yahoo.com. We note the e-mails plaintiffs lodged in their opposition date back to 2010 and 2011, about three years before they filed the instant lawsuit, and about seven years before they added Shirley as a defendant. For this reason alone, we conclude the e-mail evidence does not create a triable issue of material fact that Shirley's role in White Communications contributed to the violation of one or more of the enumerated provisions.

In addition, it is undisputed Jeff created the Whitecomm@yahoo.com website when the company was first formed, and Shirley then set up the first company e-mail account. Moreover, Shirley's name only appears in the "from" field of the e-mail header; she testified with certainty she never used the company e-mail address after she initially set up that account; and her name does not appear in the body of any of the e-mails plaintiffs lodged, supporting the inference they were not actually written or reviewed by her.

22

Thus, even construing this evidence favorably to plaintiffs (*Yanowitz*, *supra*, 36 Cal.4th at p. 1037), we independently conclude it does not create a triable issue of material fact that after 2011, Shirley's role in the company contributed to the violation of one or more of the enumerated provisions.

Plaintiffs primarily relied on the electronic signature and e-mail evidence to create triable issues of material fact that Shirley as "owner" "cause[d]" the violation of one or more of the enumerated provisions. However, plaintiffs also proffered evidence that Shirley signed various documents on behalf of White Communications that were filed with the California Secretary of State, including an Application to Register a Foreign LLC in July 2013; a Statement of Information in December 2016; a Statement of No Change in November 2017; and a Certificate of Cancellation in December 2018.

Liberally construing this and the other evidence in plaintiffs' favor, we independently conclude it does not defeat summary judgment. In each of the first three documents identified above, Shirley identified herself as an "owner" of the company under the heading "[B]usiness Title" or "Title." In the December 2016 Statement of Information, she also identified herself as a "Member," but *not* a "Manager" of White Communications.[8]

But as we have noted, at all times relevant there is no dispute between the parties that Shirley was an "owner" of White Communications. Therefore, evidence that Shirley signed these documents in this capacity does not support the inference that her role in the company included involvement

---

[8] In the December 2017 Certificate of Cancellation signed by Shirley, the box was checked stating all "members" of the limited liability company had voted to cancel its California registration. However, there was no place on this particular form for Shirley to indicate her title in the company.

23

in its management and operation, including over Jeff who made the classification decision.

Lastly, plaintiffs rely on Leung's testimony that he once met Shirley in Iowa at a training conducted by White Communications and DirecTV. Leung could not recall specifically when he met her, but estimated it was sometime in 2012 or 2013. There is no indication in his testimony what role, if any, Shirley had in this training, or if she even participated in it. Instead, Leung's testimony was limited to him meeting Shirley at the training.

Leung also testified he spoke with Shirley on the phone about work, although he could not recall what they spoke about. Leung also could not recall when they spoke, including if it was during his second "stint" with the company when he was rehired as an employee and not as an independent contractor. There also is no indication regarding the number of times he spoke with Shirley about work.

We conclude Leung's testimony that he *met* Shirley once in Iowa, and at some point spoke to her about work, without regard to when or the number of times, are insufficient—even when considered in light of all the other evidence proffered by plaintiffs—to create a material issue of fact that Shirley's role in the company contributed to, and thus "cause[d]" the violations of one or more of the enumerated provisions. "An issue of fact can only be created by a conflict of evidence. It is not created by 'speculation, conjecture, imagination or guess work.' [Citation.] Further, an issue of fact is not raised by 'cryptic, broadly phrased, and conclusory assertions' [citation], or mere possibilities." (*Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196–197.)

We thus independently conclude summary judgment was properly granted. In light of our decision, we need not address any other arguments

raised by the parties, including Shirley's argument that section 558.1 allegedly did not apply in this case because the alleged violations of the enumerated provisions occurred prior to the statute's January 1, 2016 enactment.

## DISPOSITION

The judgment is affirmed.  Shirley to recover her costs of appeal.


BENKE, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.